Mario **MANDINA**, Individually and on behalf of all persons similarly situated, Plaintiff,

v.

James **LYNN**, Secretary of the Department of Housing and Urban Development, et al., Defendants.

Civ. A. No. 20463-3.

United States District Court, W. D. Missouri, W. D.

Feb. 22, 1973.

James Kushner, Legal Aid & Defender Society of Kansas City, Mo., Kansas City, for plaintiff.

Vernon Poschel, Asst. U. S. Atty., for Western District of Missouri, Kansas City, Mo., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT FOR PLAINTIFF

WILLIAM H. BECKER, Chief Judge.

This is a civil action for the following remedies:

1. An injunction

2. A mandamus

3. A declaratory judgment under Section 2201 et seq., Title 28, United States Code

4. Damages in the amount of Twelve Thousand Dollars ($12,000.00)

In the prayer for mandamus the plaintiff requests an order to compel the defendant to perform a duty owed to plaintiff who is a low-income applicant for housing insured under Section 236 of the National Housing Act ("Act" hereinafter), Section 1715z–1, Title 12, United States Code.

In his prayer for an injunction plaintiff requests a judgment prohibiting the implementation of HUD Circular HM 4442.18 ("Circular" hereinafter), which establishes minimum income limitations for admission to housing financed under Section 236 of the National Housing Act, Section 1715z–1, *supra*. For declaratory relief plaintiff requests that a declaratory judgment be entered declaring the Circular to be of no legal force and ef-

fect. The Circular is attacked as violating

(1) The statutory purposes of Section 236;

(2) The constitutional requirements of due process of law and of the Equal Protection Clause;

(3) The Administrative Procedure Act; and

(4) HUD's own administrative provisions for the issuance of regulations.

Jurisdiction is invoked under the following provisions:

(1) The Administrative Procedure Act, Sections 701–704, Title 5, United States Code;

(2) Section 1331, Title 28, United States Code;

(3) Section 1337, Title 28, United States Code;

(4) Section 1361, Title 28, United States Code; and

(5) Sections 2201 et seq., Title 28, United States Code.

A hearing on the plaintiff's application for a temporary restraining order was held on August 1, 1972, and the Court at that time issued its temporary restraining order compelling HUD to process the plaintiff's application without regard for HUD Circular HM 4442.-18. The Court required the setting of an unsecured bond in the amount of ten dollars. As the hearing was held with the defendant present after notice having been given, the order remained in force to the present time under Rule 65, Federal Rules of Civil Procedure. In addition, F. C. Housing Company, Inc., the managing agent of the applied for housing unit, was added as a party defendant pursuant to Rule 19(a), Federal Rules of Civil Procedure. The plaintiff has filed motions to designate this a class action to compel compliance with the temporary restraining order and for summary judgment. The defendants have filed motions to dismiss, to dissolve the temporary restraining order and for summary judgment. All motions are overruled in view of the judgment herein.

On December 1, 1972, a plenary hearing on all pending motions was held. At that time, pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure, the plenary hearing was consolidated with the trial on the merits. After hearing the arguments and evidence, plaintiff's counsel was directed to file proposed findings of fact and conclusions of law. Defendants were directed to file thereafter their proposed findings within seven days of service of plaintiff's statement. The merits of this cause based upon the evidence presented at the final hearing and trial will be considered in the findings of fact, conclusions of law and final judgment herein.

FINDINGS OF FACT

On February 18, 1972 HUD issued Circular HM 4442.18 entitled "Section 236 Program Tenant Selection Policy—Establishment of Minimum Income Limit for Tenant Eligibility". The Circular provides that tenants seeking admission must have sufficient income to be able to pay the basic rent with not more than 35 percent of their adjusted income.

Pursuant to paragraph 5(b) of the Circular, the effective date thereof was as of the date of the publication of the Circular.

Subsequently, on June 13, 1972 HUD published the Circular in the Federal Register, 37 Fed.Reg. 11758 (1972). Paragraph nine (9) of that publication provided that the "policy shall be effective upon publication in the Federal Register (6–13–72)." The publication also stated in the same paragraph that comments and suggestions would be received and considered for future revision of the requirements of the Circular.

The Circular in paragraph two (2) provides that "present Section 236 regulatory agreements require an owner to give preference for occupancy to those families whose incomes are within the lowest practicable limits for obtaining

rental units in the project." While maximum income limits had been established for admission with subsidy, no specific minimum income limits had been established prior to this time.

In substance the Circular requires that an applicant seeking admission to a section 236 project must have sufficient income to be able to pay the basic rent with not more than 35 percent of his adjusted income.

The plaintiff, Mario Mandina, is married and has one child and resides in an apartment at 548 Holmes in Kansas City, Missouri.

The apartment unit which the plaintiff and his family reside in is located within the Columbus Park Neighborhood Development Program, Area 12, an urban-renewal program.

Under this urban-renewal program, the Land Clearance for Redevelopment Authority of Kansas City, Missouri acquired the plaintiff's residence on April 6, 1972.

The acquired residence of the plaintiff is dilapidated and in a general state of disrepair and is infested with rodents and insects. In addition, the acquiring agency has failed reasonably to maintain the apartment building and the lawn thereof.

The acquiring agency on June 13, 1972 issued FHA Form No. 3476 entitled "Certificate of Eligibility Under Section 221 of the National Housing Act" certifying that the plaintiff's family was being displaced by the urban renewal program.

On June 14, 1972 the plaintiff made application for membership in Meadow Ridge Townhouses, a cooperative housing project in Blue Springs, Missouri insured under Section 236 of the National Housing Act, 12 U.S.C. 1715z–1 and paid a deposit of sixty-five dollars and a processing application fee of fifteen dollars to the F. C. Housing Company, Inc., the developer and management agent for the project. In addition, a subscription agreement was executed by the plaintiff for the membership in the cooperative project. The plaintiff presented to the F. C. Housing Company, Inc., the appropriate FHA Form No. 3476 at that time. The evidence shows that the plaintiff's gross income is $4,622.[1] From this fig-

1. Relocation assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 et seq. and HUD Relocation Handbook 1371.1, Chapter 6, Section 6 (1971) is computed by taking the replacement rent ($129) less the previous rent ($40) multiplied by 48 (months). As this exceeds the maximum of $4,000, the plaintiff would receive that maximum or $1,000 per year. In the affidavit of William R. Southerland, Area Director, the government used as a rental figure for computing the relocation payment $105.

(1) Using the $105 figure, the plaintiff would be eligible for the full relocation benefits of $1,000 per year as he would have been displaced prior to August 17, 1972. Prior to August 17, 1972 the displacee received the difference between his present rent (prior to displacement) and a schedule amount based on size of family. See telegram memorandum of Thomas S. Kilbride, Rental Assistance Payments Under Section 204 of the Act, August 16, 1972 and memorandum of Emil L. Huber, Assistant Regional Administrator, Rental Assistance Payments, September 14, 1972.

As the schedule amount in Kansas City, Missouri based upon a two bedroom apartment is $150 per month, that amount less the present rent of $40 would still result in receipt of the full benefits. See proposed Schedule of Annual Gross Rentals, Land Clearance for Redevelopment Authority of Kansas City, Missouri. (2) The Plaintiff receives a National Defense Student Loan in the amount of $1,500 of which $560 is used for tuition, books and school related expenses. The affidavit of William R. Southerland, Area Director, contended that such loans cannot be considered as income. However, pursuant to HUD's memorandum from K. C. Cavanaugh, Office of Housing Programs to all Regional Directors and Area Directors issued prior to 1972, the plaintiff has $940 available for income purposes. (3) The plaintiff also receives $2,682 per year under the education assistance allowance program of the Veterans Administration. Thus $1,000 per annum relocation benefits plus $940.00 (proceeds available from student loan) plus $2,682 equals $4,622.00 gross income per annum.

ure HUD deducts five percent for income tax and social security and $300 for the plaintiff's minor child to arrive at an adjusted income in the amount of $4,090.90.[2] The "basic rent" figure is computed by HUD to include also utilities, estimated repair and redecoration costs resulting in a figure of $129. On these figures the basic rent to income ratio under the Circular would appear to be 37.83 percent if HUD has properly computed what it denominates as the "basic rent".[3]

F. C. Housing Company, Inc., the managing agent for Meadow Ridge Townhouses denied the plaintiff's application based upon the HUD Circular and it was that denial which this action challenged.

Following the issuance of the temporary restraining order, F. C. Housing Company, Inc. processed and approved the plaintiff's application and forwarded it to HUD for their approval. HUD has failed and refused to approve the plain-

tiff's application apparently on the grounds that under the Circular, the plaintiff would be ineligible for admission to the Meadow Ridge Townhouses Project.

Numerous memoranda, affidavits and HUD studies have been offered to the Court by the parties for the purpose of determining the need for the Circular.[4] The government's position is that many projects are in financial difficulties and will require increases in rent to meet increasing costs and thus, it is essential to establish minimum income requirements to assure that tenants will be able to stand the expected rent increases. However, the Report on Audit of Section 236 Multifamily Housing Program indicates that more than the income levels of tenants are affecting Section 236 Housing Projects. Plaintiff contends that it is abuses on the parts of developers, architects, consultants, sponsors and the failure of HUD to properly monitor its programs that is causing difficulties in the Section 236 programs.[5] The Indi-

2. $4,622 less five percent of $4,622 (or $231.10) and less $300 equals $4,090.90. HUD Circular HM 4442.18.

3. Computed by dividing $4,090 (adjusted income) by 12 (months) and dividing the rent ($129) by that figure, ($340.90).

4. Affidavit of William R. Southerland, Area Director, September 6, 1972, Report on Audit of Section 236 Multifamily Housing Programs, January 29, 1972; Individual and Summary Reports of the Management Team Review of the Section 236 Programs in Five Cities, affidavit of Fred Pfaender, November 17, 1972; and attached to that affidavit, Memorandum of Norman V. Watson, Housing Management to George Romney, Secretary, 236 Programs—Tenant Rent to Income Ratios; Memorandum from K. C. Cavanaugh, Office of Housing Programs to Norman V. Watson, December 21, 1971; Memorandum of Norman V. Watson to Richard C. VanDusen, January 10, 1972.

5. Plaintiff points out the following examples among others of the findings of the HUD audit:
    (a) *Section 236 projects charge higher rents than non-subsidized conventional housing.* The report states that "the market rents for Section 236 projects were generally higher than for compara-

ble conventional projects, because of certain allowances permitted by the law or regulation and ineffective administrative and operating practices." (Audit Report at 8.) The report went on to state that "tenants in the selected Section 236 projects were receiving less value than tenants in the selected conventional projects." (*Id.*)
    (b) *Architectural Fees.* The report states: "Because existing operating procedures have not been effectively applied, architectural fee allowances on Section 236 projects may have exceeded local customary allowances by about $2 million on our 62 test projects." (Audit Report at 11.) An example of the above is contained in the report as follows: "A Dallas, Texas, broker told us that in the Dallas area architectural fees for both design and supervision were customarily allowed in amounts between $75 and $175 per D.U. [dwelling unit], with a $125 per D.U. being the maximum allowable. By contrast, for the three test projects that were insured by the Dallas Field Office architectural fees averaging about $499 per D.U. were allowed. . . ." (*Id.*)
    (c) *HUD Fees for Mortgage Insurance Premiums During Construction.* The Audit found excessive fees were being

vidual and Summary Reports of the Management Team Review of the Section 236 Programs in Five Cities would appear to establish that the "administrative record" not only fails to show that rental delinquencies by low-income tenants have caused any Section 236 projects to default, but also indicate that such delinquencies have not been a significant problem in the operation of the program.[6]

It is not necessary, however, to find in this case that, as plaintiff contends, primarily abuses on the part of developers, architects, consultants, sponsors and the failure of HUD properly to monitor its programs have caused the need for the issuance of the Circular, HM 4442.-18, because plaintiff already meets the income requirements of this Circular.

illogically charged (Audit at 14.)

(d) *Need for Housing Consultants.* Fees ranging from $15,000 to $27,000 were permitted for consultants by HUD. The Audit found that these consultants actually added time to the development process and further that their services are unnecessary and are duplicative of HUD staff abilities.

(e) *Incentive Allowances.* The Audit found that present HUD procedures allow "cost savings" to builders who complete projects under the estimated time. The report further indicated that HUD is unaware of the expected time for completion and the result has been over-estimates by the builders resulting in massive unearned incentive payments. (See Audit Report at 17–19) The report cited unsound estimating practices by HUD on the following illustrations: (1) Mortgage insurance premium estimates (Audit Report at 19). (2) Construction time estimation (Audit Report at 20–21). (3) Premature project advances (Audit Report at 21–23). (4) Off-site and demolition costs (Audit Report at 23–25). Here the Audit Report found that builders obtained the cost of such improvements in the land appraisal and later added the costs to the development costs (thus it became part of the mortgage again) and in addition, attained a 10% profit of the development cost. (5) Federal wage requirements. The Audit Report (at 25) indicated that the requirement of Federal wage minimums adversely affect the cost of the produced housing.

In the affidavit of William R. Southerland, Area Director of the Kansas City, Kansas Area Office of the Development of Housing and Urban Development (Defendant's exhibit no. 1, p. 2), Mr. Southerland states the following with respect to the method of computation of the amount of money to be given to the plaintiff as relocation benefits:

" . . . This figure was based on $40 per month paid by Mr. Mandina for his present dwelling and *$105 per month* which will be the *base rent* for the new dwelling . . . ." (Emphasis added.)

If this "base rent" or "actual rent" ($105.00) is used as the proper figure in the computation of the rent-to-income ratio, a rent-to-income ratio of 30.8% results. This percentage places the

6. Plaintiff claims that the following pertinent findings, among others, reported in the Summary Report are:

a) "the average 236 tenant in this non-rent supplement category pays about 34 percent of adjusted income for rent" (Summary Report, p. 1); and b) that "relatively few problems are being encountered with payment of rent" (Summary Report, p. 2). Furthermore, while it was found that "rental arrears were more of a problem in San Francisco than in the other cities reviewed," San Francisco, in fact, had the lowest average rent to adjusted income ratio—28 percent. (San Francisco Report, pp. 5 and 2.) At the same time, in San Diego, which had the highest average rent to adjusted income ratio—38 percent (San Diego Report, p. 2), no projects were in default. (*Ibid.*, at p. 4.) Of the six projects studied there, two reported that all rents were paid when due; the third reported no tenants accounts receivable; the fourth reported accounts receivable which were considered low and, although the fifth and sixth projects reported high accounts receivable, the level of delinquency in one of those two was specifically attributed to the project location. (*Ibid.*, at p. 6.) Findings such as these hardly support the assertions and assumptions that inability of low-income tenants to pay rent has been a major factor in the instability of the Section 236 program.

plaintiff well within the 35% ratio required by the Circular.[7] Thus the plaintiff easily qualifies for admission to the housing project even if, assuming solely for the purposes of this decision but not so finding, the Circular is valid and applicable to this case.

The government maintains that the "basic rent" figure ($129.00) is the proper figure to use in the computation of the required rent-to-income ratio. In its brief in support of the defendant's proposed findings of fact and conclusions of law, it computes the "basic rent" as follows:

| "$105.00 | amount required to amortize mortgage amount at 1% interest |
| $ 8.50 | estimated heating expense |
| $ 10.50 | estimated electric expense |
| $ 3.00 | estimated needs for periodic redecorating |
| $ 2.00 | estimated average monthly repair costs |
| $129.00" | |

The applicable provision, Section 1715z–1(f), Title 12, United States Code, states in pertinent part as follows:

"For each dwelling unit there shall be established with the approval of the Secretary (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest due under a mortgage bearing interest at the rate of 1 per centum per annum. . . ."

The legislative history of this section is revealed in the House Report No. 1585, 90th Congress, 2nd Sess. (1968); 2 U.S.Code & Admin. News, p. 2894, which reads in pertinent part:

"These interest reduction payments would reduce rentals to a basic rental charge, determined for each unit on the basis of operating the project with such payments. . . ."

■ On the basis of this statutory provision, Section 1715z–1(f), *supra* and the legislative history thereof, it is found that the "basic" rent is the amount required to operate the project and includes the amount necessary to amortize the mortgage at one percent interest. The "basic" rent cannot legally include the amount estimated for utilities and for repairs and periodic redecorations in this project.

The government in its brief admits that $105 is the amount required to amortize the mortgage amount at one percent interest.

■ Thus when the basic rent is established as $105, the plaintiff clearly is able to pay the basic rent with not more than thirty-five percent of his adjusted income as required by this Circular and thus he qualifies for membership in Section 236 housing, such as the Meadow Ridge Townhouse Project, the housing in question.

## JURISDICTION

■ This Court has jurisdiction of the cause herein under Section 1331, Title 28, United States Code, since this is an action arising under the Constitution and Laws of the United States and the value of the subsidy which could enure to the plaintiff's benefit exceeds the sum of $10,000.

■ Further jurisdiction of this cause is also present under Section 1337, Title 28, United States Code, since this is a civil action arising under the National Housing Act which is an act of Congress regulating commerce. United States v. Emory, 314 U.S. 423, 433, 62 S.Ct. 317, 86 L.Ed. 315. On its face the complaint herein does show that the National Housing Act is a statute regulating commerce in that the discriminatory operation of private rental housing, especially in the case at bar where such private rental housing is subsidized by the federal government, has been "deemed adequate to show a constitutionally prohibitable adverse effect on commerce." Atlanta Motel v. United States, 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258, 277; Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13

---

7. This percentage of 30.8% was computed by dividing $4,090 (adjusted income) by 12 (months) and dividing the actual rent ($105) by that figure ($340.90).

L.Ed.2d 290; Jones v. Mayer, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189.

In support of its contention that the complaint does not on its face show that the National Housing Act is a statute regulating commerce the defendant refers to Mamber v. Second Federal Savings and Loan Association (D.Mass.) 275 F.Supp. 170, wherein the court held that the complaint would be dismissed for lack of jurisdiction over the subject matter because the complaint contained no statement of the grounds upon which the court's jurisdiction depends and also because the Home Owners' Loan Act of 1933, § 1461 et seq., Title 12, U.S.C., is not an act regulating commerce such as might make applicable the provisions of Section 1337, Title 28, U.S.C. Clearly, the case at bar is readily distinguishable from the case of Mamber v. Second Federal Savings and Loan Association, *supra*. The complaint in the case at bar does contain a statement of the proper grounds upon which this Court's jurisdiction is invoked and does in fact depend.

Plaintiff's action for declaratory and injunctive relief is authorized by 28 U.S.C. Sections 2201, 2202, and Rule 57, Federal Rules of Civil Procedure.

■ The plaintiff has standing under all existing tests in that he has a personal stake in the outcome of this matter and is clearly within the zone of interests protected by Section 236 of the National Housing Act. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The plaintiff clearly meets the test of "injury in fact". Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Davis, The Liberalized Law of Standing 37 U.Chi.L.Rev. 450, 472 (1970).

■ The government has raised as a defense the plaintiff's failure to allege a case or controversy presently capable of judicial resolution. It is abundantly clear that the judicial power of the federal courts is limited to actual cases or controversies. However, this action presents an obvious case or controversy under Article III, Section 2 of the Constitution of the United States.

The government's motion to dismiss is based upon the lack of standing and the failure to allege a case or controversy and that motion lacks merit.

CONCLUSIONS OF LAW

■ The F. C. Housing Company, Inc. has been joined by order of the Court pursuant to Rule 19(a), Federal Rules of Civil Procedure, because in its absence complete relief cannot be granted. As managing agent of Meadow Ridge Townhouses, it was essential to join F. C. Housing Company, Inc. to assure that the status quo of the plaintiff's application be maintained during the pendency of this litigation.

■ The hearing on the motions of the parties including motions for summary judgment filed by each side have been consolidated with the trial on the merits pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure.

The summary judgment motions filed by the plaintiff and the government are denied without prejudice to the legal contentions of the parties and the facts contained therein so as to permit this matter to proceed to a trial on the merits of the action.

■ The plaintiff's motion to designate this a class action is denied to accommodate the plaintiff so that final relief is not delayed and to permit the priority of a hearing on the merits of this case. Further the requirements of Rule 23, Federal Rules of Civil Procedure, for a class action are not shown to exist in this case.

The defendant James Lynn, Secretary of the Department of Housing and Ur-

ban Development, is charged with administering the provisions of the National Housing Act, 12 U.S.C. Sections 1701–1750g, and, in particular, Section 236 of the Act, 12 U.S.C. Section 1715z–1, and under the provisions of that Act he is authorized in his official capacity to sue and be sued in any court of competent jurisdiction, state or federal.

The plaintiff has been wrongfully and illegally denied admission to the Meadow Ridge Townhouses, a cooperative housing project, insured under Section 236 of the National Housing Act.

The original contention of the Department of Housing and Urban Development is that notwithstanding the Circular (HM 4442.18) that the plaintiff would normally be rejected from the Meadow Ridge Townhouses based upon inadequate income. The evidence does not support this position, while the plain reading of that Circular indicates in paragraph 2 that:

> "Present Section 236 Regulation Agreements require an owner to give preference for occupancy to those families whose incomes are within the lowest practicable limits for obtaining rental units in the project. While maximum income limits have been established for admission with subsidy, no specific minimum income limits have been established prior to this time."

Therefore, the position of the government, and specifically the position outlined in the affidavit of William R. Southerland, Area Director, is untenable, and for that reason the defendant's motion to dissolve the temporary restraining order is denied.

In addition, the Court finds that the Department of Housing and Urban Development has not complied with the Court's temporary restraining order. However, in light of the relief granted herein following a final hearing on the merits, the motion of the plaintiff to compel compliance with the temporary restraining order is moot.

■ As an independent separate ground for relief, it is concluded that the Circular (HM 4442.18) as promulgated violates the statutory intent of Congress in passing Section 236 of the National Housing Act, Section 1715z–1, *supra,* for the reasons stated by Judge Peckham in Findrilakis v. Secretary of the Department of Housing and Urban Development (N.D.Calif.) 357 F.Supp. 547, Civ.No. C–72–801 RFP (January 16, 1973).

HUD regulation in § 236 Handbook, 4442.1(25) at 19, clearly sets out that " . . . preference for occupancy will be given to those displaced from their homes by urban renewal. . . . " HUD Circular HM 4442.18 undermines the intent of Congress in enacting the National Housing Act as well as the intent and goals of the federal urban renewal law. See 42 U.S.C. Section 1441 et seq.

The HUD Circular violates the Due Process Clause of the Fifth Amendment to the United States Constitution as it creates a conclusive presumption that a tenant cannot afford to pay the required rent, regardless of the tenant's actual ability to pay.

Without allowing proof of actual facts, HM 4442.18 conclusively presumes that any tenant who would be required to pay more than 35 percent of his "adjusted monthly income" cannot afford to live in a Section 236 project. This is described as a "simple" method of determining a tenant's lowest practicable income. *See* HM 4442.18 (letter of notification). But its effect has been to exclude applicants who have proved to their landlords and stand ready to prove to HUD their actual ability to pay the required rent—an ability which HUD has in no way refuted.

Doubtless it is far easier for HUD to use conclusive presumption to dismiss the plaintiff's contentions that he can afford to pay his rent than to evaluate his claims in light of the actual facts. But this is what due process forbids. A

conclusive presumption which operates to deny private parties the opportunity to establish a statutory entitlement such as that at issue herein has long been deemed unconstitutional. *See,* e. g., Dunn v. Blumstein, 405 U.S. 330, 92 S. Ct. 995, 1006–1007, 31 L.Ed.2d 274 (1972); Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932); Schlesinger v. Wisconsin, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926). As the court stated in United States v. Bowen, 414 F.2d 1268, 1273 (3rd Cir. 1969):

> "No administrative agency, nor even a legislative, may make the proof of one fact conclusive proof of another fact in any proceeding, civil or criminal, to the detriment of a private party."

### HUD CIRCULAR HM 4442.18 VIOLATES THE PROCEDURAL REQUIREMENTS OF PROMULGATION OF HUD ITSELF

The plaintiff originally alleged that the Administrative Procedure Act required that, prior to promulgating agency regulations of the type here in question, there had to be publication in the Federal Register with the opportunity to comment by interested parties, 5 U.S.C. § 553. However, since the United States Court of Appeals for the Eighth Circuit decided the case of Housing Authority of Omaha v. United States Housing Authority, 468 F.2d 1 and (1972), it appears that the APA requirements may not directly apply to Section 236. Nevertheless, the plaintiff points out and is correct that the Secretary of Housing and Urban Development is bound by his own regulations which provide for the same procedural requirement. 24 C.F.R. § 10.5, 36 Fed.Reg. 4291 (March 4, 1971). Under that regulation HUD must publish its rules and regulations in the Federal Register at least thirty days before their effective date "to afford interested persons an opportunity to participate in the formulation of the final language of such rules and regulations through submission of written data, views or arguments." Rules and regula-

tions are defined to include circulars. 24 C.F.R. § 10.3(b). This regulation is binding upon HUD, because "when an administrative agency promulgates rules to govern its proceedings, these rules must be scrupulously observed . . . even when the defined procedures are 'generous beyond the requirements that bind such agency'." Pacific Molasses Co. v. F. T. C., 356 F.2d 386, 389 (5th Cir. 1961). *See also,* Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959); Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); United States v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

Although HUD publication procedures exempt advance publication and notice where "impracticable, unnecessary, or contrary to the public interest" (24 C. F.R. § 10.5) and although this HUD Circular HM 4442.18 did invoke this exemption (37 Fed.Reg. 11758, June 13, 1972), there are no facts shown or appearing which could demonstrate the alleged impracticability or alleged emergency in order to justify the publication of this Circular without proper notice pursuant to HUD's own regulations. In this respect it is noteworthy that in the case of Findrilakis v. Secretary of the Department of Housing and Urban Development, *supra,* Judge Robert H. Peckham stated the following:

> " . . . After the commencement of this litigation when it became obvious that this section [24 C.F.R. § 10.5] applied to this circular, and that the regulation had not been complied with, H.U.D. withdrew the circular. Twenty-six days later it republished the circular for immediate effectiveness, the Secretary having determined that the thirty day comment period was impracticable, unnecessary or contrary to public interest. It is doubtful whether publication for immediate effectiveness can be sustained in light of the prior admittedly illegal act. Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). This is especially so when the Secre-

tary provides no explanation for his finding. And while no formal finding is required, the absence of any explanation for the use of this "emergency" power to bypass the notice requirement cannot be lightly sustained. Cf. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 at 417, 91 S.Ct. 814, 28 L.Ed.2d 136." 357 F.Supp. 846, Civil No. C–72–801 RFP at p. 12. (Footnote).

In view of the foregoing and in the absence of any exceptional circumstances such as an emergency not shown to be present in the case at bar, it is found that the Secretary of Housing and Urban Development has violated HUD's own regulations respecting the proper notice requirements as to publication of circulars set forth in 24 C.F.R. § 10.5, 36 Fed.Reg. 4291. With respect to plaintiff's claim for damages it is found that no circumstances exist that would warrant the award of damages.