Sarah Mae JOHNSON et al.

v.

COUNTY OF CHESTER et al.

Civ. A. No. 75–3702.

United States District Court,
E. D. Pennsylvania.

May 26, 1976.

**1302**

Mark S. Schwartz, David H. Moskowitz, Regional Housing Legal Services, Newtown, Pa., for plaintiffs.

John S. Halsted, James E. McErlane, West Chester, Pa., for County and Commissioners of Chester.

Robert J. Shenkin, West Chester, Pa., for Willistown Township and Supervisors.

Stephanie P. Lachman, Economic Litigation Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for HUD.

LUONGO, District Judge.

This is an action under the Housing and Community Development Act of 1974, 42 U.S.C. § 5301, et seq. (Supp.1976) (hereinafter HCDA), the Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq., the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., the Civil Rights Act of 1866, 1870 and 1871, 42 U.S.C. §§ 1981, 1982, 1983, and the Fifth and Fourteenth Amendments to the United States Constitution.

Plaintiffs, low income and non-white citizens of Chester County, Pennsylvania (County), seek a declaration that a grant of federal funds to County violates their rights under the above-cited statutes and the Constitution of the United States and they seek to enjoin transfer of such of the federal funds to County as are earmarked for Willistown Township, a political subdivision of County. Non-federal defendants are the public entities, Chester County and Willistown Township, together with the individual members of the Board of Commissioners of Chester County and the Supervisors of Willistown Township. Federal defendants are the Department of Housing and Urban Development (HUD), and the Secretary, the Regional Administrator and the Area Director of HUD.

The case is before me on plaintiffs' motion for preliminary injunction and motions to dismiss filed by the non-federal defendants.

To further an understanding of the present action, it is helpful to outline the scheme of the HCDA. The passage and approval of the Act was the congressional response to the increasing deterioration of the nation's urban centers. The paramount objective of the Act "is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). To that end, the Secretary of HUD is empowered to make grants to the States and their political sub-divisions to finance community development programs for a sum not to exceed 8.4 billion dollars prior to the end of fiscal year 1977. 42 U.S.C. § 5303.

The provisions of the HCDA most relevant to the present action are §§ 5304, 5309, and 5311.

Section 5304 sets forth the specific requirements and obligations of the applicant and the Secretary. Compliance with these provisions is mandatory in that no grant may be made unless the requirements are met.[1] These requirements include: (a) a summary of the particular development plan which identifies the community needs, discloses a "comprehensive strategy" to accomplish these needs, and specifies short and long term development objectives consistent with area wide planning and urban

---

1. Section 5304(b)(3) provides for the limited circumstances in which the Secretary may waive the requirements of § 5304(a)(1)(2) and (3). These circumstances are not present in the matter before me.

policies. 42 U.S.C. § 5304(a)(1); (b) formulation of a program which includes the activities to be undertaken and the costs and location thereof, alternative sources available to meet community needs and objectives, and considers environmental factors. 42 U.S.C. § 5304(a)(2); (c) the description of a program geared to eliminate and prevent urban deterioration and provide essential public services where needed. 42 U.S.C. § 5304(a)(3); (d) the submission of a housing plan which assesses the conditions and needs of lower income, elderly and handicapped families, specifies realistic goals for meeting these needs in terms of construction, indicates the location of this housing with the objectives of revitalization, restoration and avoidance of undue concentration of assisted persons in areas having a high proportion of low income families, and assures the existence of adequate public services. 42 U.S.C. § 5304(a)(4); (e) assurances that the program will be conducted and administered in conformity with Title VI of the Civil Rights Act of 1964 and Title VIII of the Fair Housing Act of 1968. 42 U.S.C. § 5304(a)(5); (f) assurances of adequate citizen participation in the application for the plan. 42 U.S.C. § 5304(a)(6); and (g) a certification, to the satisfaction of the Secretary, that the community development plan will primarily benefit low or moderate income families, or aid in the prevention or elimination of urban slums. The applicant may also certify that the program is designed to meet other needs of "particular urgency." 42 U.S.C. § 5304(b)(2).

Once the applicant has complied with the above requirements, the role of the Secretary comes into focus under § 5304(c). This section provides that an application must be approved unless the Secretary determines: (a) that the applicant's description of its needs and objectives is "plainly inconsistent" on the basis of generally available facts or data, 42 U.S.C. § 5304(c)(1); (b) that the planned activities are "plainly inappropriate" to meeting the specified needs and objectives, 42 U.S.C. § 5304(c)(2); or (c) the application does not comply with the requirements of the Act or other applicable law or proposes ineligible activities, 42 U.S.C. § 5304(c)(3).

Section 5304(d) provides for the submission of annual reports to the Secretary. These reports must contain: (a) a performance evaluation regarding the activities carried out pursuant to the grant; and (b) an assessment as to whether the activities conform to the objectives of the Act as well as the grantee's stated needs and objectives. Further, this section requires the Secretary to make such reviews and audits as are necessary to determine whether the grantee is administering and conducting its development program as set forth in the application, whether that program is in conformity with the Act and other applicable laws, and whether the grantee retains the capacity to carry out the approved program of development. The Secretary is then empowered to make whatever adjustments are appropriate in the amount of the annual grants in light of the findings made pursuant to the review and audit.

Section 5304(f) provides that any application subject to the Secretary's approval under subsection (c), is deemed approved upon the passage of 75 days unless the Secretary acts affirmatively to disapprove by notifying the applicant of the specific reasons for disapproval.

Section 5304(g) empowers the Government Accounting Office to audit the financial transactions of recipients insofar as they relate to the funds provided under the Act.

Section 5309(a) contains a non-discrimination clause applicable to any programs or benefits funded under this Act. Section 5309(b) provides that if the Secretary should determine that any recipient of assistance under the Act has failed to comply with subsection (a), the Secretary is to notify the chief executive officer of the state or unit of local government in an attempt to secure compliance. If such compliance is not forthcoming in sixty days, the Secretary is authorized to recommend to the Attorney General of the United States that an appropriate civil action be instituted, or to

exercise such other powers or functions as provided by law.

Section 5311(a) empowers the Secretary to terminate, reduce or limit payments made to recipients under this Act if the Secretary finds that the grantee has failed to comply with any provisions of the Act. Subsection (b) permits the Secretary to refer the matter to the Attorney General if the Secretary has reason to believe that the recipient has failed to comply "substantially" with any provisions of the Act. Subsection (c) provides the basis for judicial review to any recipient who receives notice of any action taken by the Secretary pursuant to subsection (a).

The scheme of the Act, in short, contemplates a continuing relationship and "dialogue" between HUD and the grantee during the three year tenure of a given community development project. *Knoxville Progressive Christian Coalition v. Testerman,* 404 F.Supp. 783, 789 (E.D.Tenn.1975).

Resort to the legislative history of the Housing and Community Development Act reinforces this conclusion. In adopting requirements for application and review, the stated congressional purpose was to:

> " . . . streamline the existing procedures of the categorical programs; to expand the role and responsibility of local governments in implementing community development programs; and to reduce the considerable processing burden now borne by HUD." 3 U.S.Code Cong. & Admin.News, p. 4324 (1974).

As to the role of the Secretary, the legislative history reveals that:

> "The Secretary's review should be limited in its scope, but should include both substantive and legal aspects. The Secretary, before approving applications, should be satisfied that the purposes of the chapter, as well as other Federal Laws related to development, such as contained in the Equal Opportunities, Environmental Protection, and the A–95 Programs, are being met. The Commit-

tee anticipates that the Secretary, in establishing review procedures, would incorporate a reasonable review of the available information related to local needs; of projected program benefits in relation to the community's needs; of the consistency and comprehensiveness of the program in light of the objectives of the bill; and of the actual progress achieved with the Federal assistance provided. The Committee, however intends to reduce significantly the unnecessary 'second-guessing by Washington' that has been criticized under existing programs. It believes that the shift from project to program review will accomplish this, in large measure. The statute would eliminate many of the determinations that the Secretary must now make under the categorical programs. At the same time, the statute would strengthen some provisions for statutory review in order to assure an active and effective administration of the program." 3 U.S.Code Cong. & Admin. News, p. 4325 (1974).

Furthermore, regarding the Secretary's role in approval of an application, it was noted that:

> "It is intended that the Secretary administer these requirements in a manner which gives communities a reasonable benefit of the doubt in marginal cases. These requirements do not specifically forbid approval of a pending application if the community's proposed program . . . appears to lack compliance with obligations. However, the Committee clearly expects that when the Secretary has substantial reason to believe that a requirement of the bill will not be fulfilled, he will disapprove the pending application at least partially, until the problem is resolved." 3 U.S.Code Cong. & Admin.News, p. 4328 (1974).

Having set forth the statutory scheme and legislative intent for HCDA, I will now turn to the facts of the matter before me.

On May 30, 1975, Chester County submitted its application to HUD for a Block Grant as an "urban county" [2] seeking $575,-

---

**2.** Chester County, a political subdivision of the Commonwealth of Pennsylvania, qualifies as

an "urban county" under § 5302(a)(6) of the HCDA.

000 to be expended for community development and assistance over a three year period by forty-four participating communities of Chester County. Willistown Township was to receive $9,000 during the first year, and $18,000 in the second year of the program for the construction of storm sewers.[3]

As before noted, the Act provides that applications are deemed approved unless the Secretary affirmatively disapproves within 75 days of receipt of the application. 42 U.S.C. § 5304(f). County's application had been received on May 30, 1975. On July 28, 1975, approximately two weeks before the expiration of the 75 day period, plaintiffs' counsel informed the HUD Regional Office that, because certain zoning regulations of Willistown Township had been held to be unconstitutionally exclusionary, HUD's approval of the grant of funds to that Township constituted, in counsel's opinion, a violation of HUD's statutory duties. In spite of receipt of that notification, HUD approved the grant of the first year's funds on August 12, 1975. This suit was instituted December 30, 1975.

The complaint alleges that on July 18, 1975, the Pennsylvania Supreme Court declared the Willistown Township zoning ordinance to be unconstitutionally exclusionary because it tended to produce a pattern of "selective admission" into the Township;[4] that this exclusionary pattern existed at the time the Block Grant application was received and was acted upon by HUD; and that defendants knew or should have known of this pattern.[5]

The complaint is in six counts. Count I charges that the federal defendants' failure to consider the legal issues raised by plaintiffs' letter of July 24, 1975, constitutes arbitrary and capricious action, and an abuse of discretion in violation of § 5304(c)(3) of the HCDA and § 706(2) of the Administrative Procedures Act. Count II charges that the non-federal defendants' assurances and certification made pursuant to § 5304(a)(5) are invalid, and that the federal defendants' acceptance thereof was arbitrary and capricious, and an abuse of discretion in violation of § 5304(a)(5), (b)(4) and (c)(3) of the HCDA, and § 706(2) of the APA. Count III charges all defendants with a general violation of the HCDA and the regulations promulgated thereunder. Count IV charges that the non-federal defendants' planned usage, and the federal defendants' approval, of the disputed portion of the Chester County application constitutes a violation of § 3608(d)(5) of the Fair Housing Act of 1968, which requires the Secretary of HUD to promote the national policy of "fair housing" in the administration of programs relating to housing and urban development. Count V charges that the non-federal defendants' planned usage, and federal defendants' approval, of the disputed portion of the Chester County application violates § 2000d of the Civil Rights Act of 1964 which proscribes discrimination in any federally-assisted programs. Count VI charges all defendants with violation of §§ 1981, 1982, and 1983 of the Civil Rights Acts of 1866, 1870 and 1871, as well as violation of the Fifth and Fourteenth Amendments to the Constitution of the United States.

## DISCUSSION

The non-federal defendants have moved to dismiss the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Federal defendants filed briefs in opposition to plaintiffs' motion for preliminary injunction in which they argued that

---

3. At all times during the preparation, review and approval of the application, HUD dealt exclusively with the County. Similarly, when the County contracted for services eligible under the grant, it dealt exclusively with the contractors. The only participation by the individual municipalities was submission of proposals regarding their specialized needs and the signing of "cooperation agreements." See § 5304(a)(6).

4. *Township of Willistown v. Chesterdale Farms, Inc.,* 341 A.2d 466 (Pa.Sup.Ct.1975).

5. In support of this allegation, the complaint sets forth demographic data on Willistown Township for the twenty year period ending 1970. See Plaintiffs' Complaint at paragraphs 22–23.

the court lacks jurisdiction of the subject matter. Although federal defendants did not file a motion to dismiss, Rule 12(h)(3) requires dismissal of an action whenever it appears that jurisdiction is lacking. *Mansfield, Coldwater & Lake Michigan Ry. Co. v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed.2d 462 (1884).

Plaintiffs have advanced numerous grounds for federal jurisdiction, but they have failed to observe the admonition of Rule 8(a) that "a pleading which sets forth a claim for relief . . . shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends," leaving it to the court to mix and match the appropriate jurisdictional grounds with the respective claims advanced.

### Administrative Procedure Act

■ Plaintiffs contend that there is jurisdiction for this suit under § 10 of the APA, 5 U.S.C. §§ 701–706. Although the precise question has not been decided by the Supreme Court, and lower federal court decisions are in conflict,[6] the cases decided in the Third Circuit are in agreement that § 10 does not provide an independent grant of jurisdiction to review agency action. *Getty Oil Co. v. Ruckelshaus,* 467 F.2d 349 (3d Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973); *Zimmerman v. United States,* 422 F.2d 326 (3d Cir.), *cert. denied,* 399 U.S. 911, 90 S.Ct. 2200, 26 L.Ed.2d 565 (1970); *Operating Engineers Local 542 v. NLRB,* 328 F.2d 850 (3d Cir.), *cert. denied,* 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964); *Bucks Co. Board of Commissioners v. Interstate Energy Co.,* 403 F.Supp. 805 (E.D.Pa.1975); *Raitport v. National Bureau of Standards,* 378 F.Supp. 380 (E.D.Pa.1974).

### Declaratory Judgment Act

Plaintiffs further assert that the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, is a source of jurisdiction for this suit. The question whether the Declaratory Judgment Act furnishes the District Courts with jurisdiction is not a novel one. Under the predecessor statute, 28 U.S.C. § 400, the Supreme Court held that the Act was "procedural only." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 463, 81 L.Ed. 617, 621 (1937). The identical issue was raised shortly after the passage of the present statute. Mr. Justice Frankfurter, speaking for the Court in *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 879, 94 L.Ed. 1194 (1950), reiterated:

"Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction. . . . '[J]urisdiction' means the kinds of issues which give right to entrance to federal courts. Jurisdiction in this sense was not altered by the Declaratory Judgment Act."

■ In short, absent an independent basis upon which jurisdiction may rest, plaintiffs may not rely upon the provisions of the Declaratory Judgment Act. *Thompson v. Groshens,* 342 F.Supp. 516 (E.D.Pa.1972), *aff'd on other grounds,* 475 F.2d 127 (3d Cir.), *cert. denied,* 414 U.S. 825, 94 S.Ct. 127, 38 L.Ed.2d 58 (1973).

### Mandamus

■ The plaintiffs cite the mandamus provision, 28 U.S.C. § 1361 as a jurisdictional basis for the present action. See *United States v. Commonwealth of Pennsylvania,* 394 F.Supp. 261 (M.D.Pa.1975).

That section provides:

"The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

The test which has emerged in the application of this section is to characterize the

---

**6.** See, e. g., *Estrada v. Ahrens,* 296 F.2d 690 (5th Cir. 1961), *Brennen v. Udall,* 379 F.2d 803 (10th Cir. 1967) (independent grant of jurisdiction). Contra: *Kansas City Power & Light Co. v. McKay,* 96 U.S.App.D.C. 273, 225 F.2d 924 (1955); *Ove Gustavsson Contr. Co. v. Floete,* 278 F.2d 912 (2d Cir. 1960).

nature of the duty which the action seeks to compel the federal officer to perform. If the duty is determined to be ministerial, jurisdiction will lie, but if the administrative duty for which mandamus is sought is determined to be discretionary, jurisdiction will be denied.[7]

The rule was set forth by Chief Justice Taft in *Work v. United States ex rel. Rives,* 267 U.S. 175, 177–78, 45 S.Ct. 252, 69 L.Ed. 561, 562 (1925):

"Mandamus issues to compel an officer to perform a purely ministerial duty. It cannot be used to compel or control a duty in the discharge of which by law he is given discretion. The duty may be discretionary within limits. He cannot transgress those limits, and if he does so, he may be controlled by injunction or mandamus to keep within them. The power of the court to intervene, if at all, thus depends upon what statutory discretion he has. Under some statutes, the discretion extends to a final construction by the officer of the statute he is executing. No court in such a case can control by mandamus his interpretation, even if it may think it erroneous. . . . [The] extent [of discretion] and the scope of judicial action limiting it depend upon a proper interpretation of the particular statute and the congressional purpose.

*Accord: Davis Associates, Inc. v. Sec., Dept. of Housing and Urban Development,* 498 F.2d 385, 389 (2d Cir. 1974). In addition, the moving party must establish a clear right to the relief sought, and that he has no other adequate remedy. *Lovallo v. Froelke,* 468 F.2d 340 (2d Cir. 1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973).

Plaintiffs have failed to articulate the claim for mandamus. The complaint, however, may be interpreted as follows. Certain provisions of the HCDA command compliance with the Civil Rights Act of 1964, the Fair Housing Act of 1968, and other statutory directives before any grant

may be made. These obligatory standards, coupled with the Secretary's awareness of Willistown's exclusionary land use regulations created a duty in the Secretary to reject the application of Chester County, or, in the alternative, to withhold the disputed funds. It follows, urge the plaintiffs, that this duty is enforceable by means of a mandamus action. I am not persuaded by the argument.

The plaintiffs rely upon § 5304(a)(5), (b)(4) and (c)(3) of the HCDA as the source of the Secretary's alleged ministerial duty.

Section 5304:

(a) No grant may be made pursuant to section 5306 of this title unless an application shall have been submitted to the Secretary in which the applicant—

\*　　\*　　\*　　\*　　\*　　\*

(5) provides satisfactory assurances that the program will be conducted and administered in conformity with Public Law 88–352 and Public Law 90–284.

\*　　\*　　\*　　\*　　\*　　\*

Section 5304(b)

\*　　\*　　\*　　\*　　\*　　\*

(4) The Secretary may accept a certification from the applicant that it has complied with the requirements of paragraph (5) and (6) of subsection (a) of this section.

Section 5304:

(c) The Secretary shall approve an application for an amount which does not exceed the amount determined in accordance with section 5306(a) of this title unless—

\*　　\*　　\*　　\*　　\*　　\*

(3) the Secretary determines that the application does not comply with the requirements of this chapter or other applicable law or proposes activities which are ineligible under this chapter.

It is clear to me that the Secretary is invested with a large measure of discretion in determining whether "satisfactory assur-

---

7. See Note, Mandamus in Administrative Actions: Current Approaches, 1973 Duke L.J. 207 (1973).

ances" have been given by the applicant (§ 5304(a)(5)); whether to accept certification from the applicant regarding compliance (§ 5304(b)(4); 24 C.F.R. § 570.303(e) (1975)); and in determining whether an application has failed to comply with any of the applicable statutory requirements or proposes ineligible activities (§ 5304(c)(3)).

Plaintiffs' challenge, in effect, goes to the means selected by the Secretary to fulfill the obligations of § 5304(c)(3). As the legislative history discloses, it was the intent of Congress to "streamline the existing procedures," in part, by leaving the review procedures to HUD, expecting disapproval of an application only where the Secretary has "substantial reason to believe that a requirement of the bill will not be fulfilled." In short, it is clear that Congress intended the Secretary to have discretion also in establishing the appropriate review procedures for approval of community development plans.

This is not to say, however, that mandamus relief in this type of case is never appropriate. If the record had disclosed an unexcused omission of the requirements of § 5304(a), see *City of Hartford v. Hills*, 408 F.Supp. 889 (Dist.Conn., filed Jan. 28, 1976), or an approval by the Secretary of an application which evidenced a "substantial reason to believe that a requirement of the bill will not be fulfilled," an action for mandamus might well lie. Such, however, is not this case and I conclude, therefore that the mandamus section, 28 U.S.C. § 1361, does not furnish jurisdiction for this action.

### Federal Question Jurisdiction

Plaintiff seeks to invoke federal question jurisdiction under 28 U.S.C. § 1331 which provides that:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

At the outset, plaintiffs are confronted with the barrier that the "matter in contro-

versy" does not exceed $10,000. Plaintiffs have attacked the portion of the grant to County earmarked for Willistown Township.

Plaintiffs argue that since the HCDA contemplates three year programs, the amount in controversy should be computed by aggregating the amount requested and approved for the three year period. For Willistown Township, that sum is $27,000. During oral argument, plaintiffs cited *Joy v. Daniels*, 479 F.2d 1236, 1239 n. 6 (4th Cir. 1973), as support for that contention.

*Joy* involved an action in which a tenant sought to challenge her threatened eviction by a landlord who received rent supplements under the federal housing laws. The action was maintained under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). The court concluded that the scheme of the federal housing laws afforded plaintiff a procedural due process property right or entitlement to continue occupancy until there exists a cause to evict other than the mere expiration of the lease. It was noted, in *dictum*, that an alternative source of jurisdiction existed in the federal question statute:

" . . . if plaintiff's life expectancy is as much as a decade or less the 'bargain' value of her lease would seem to have a value greater than $10,000." 28 U.S.C. § 1331.

See also *Anderson v. Denny*, 365 F.Supp. 1254, 1259 (W.D.Va.1973); and *Mandina v. Lynn*, 357 F.Supp. 269, 276 (W.D.Mo.1973).

In a similar context, an aggregation of future installment payments for death benefits under a Workman's Compensation statute was allowed because "the right to all the payments is in issue." *Aetna Casualty & Surety Co. v. Flowers*, 330 U.S. 464, 468, 67 S.Ct. 798, 800, 91 L.Ed. 1024, 1027 (1947). *Cf.* 1 Moore's Federal Practice, ¶ 0.93[5.–1] (1975).

■ I have no difficulty in agreeing that the "matter in controversy" in the above cases involved payments extending over a period of years. But in the instant case, the "matter in controversy" is the first year funding for the construction of storm sew-

ers by Willistown Township. That sum is $9,000. The funds earmarked for the second year, $18,000, are not "ripe" for controversy. Section 5304(d) of the HCDA provides for annual review of the performance made by the grantee, particularly in regard to the statements of needs and assurances under § 5304(a). To that end, the Secretary is empowered to make "appropriate adjustments in the amount of the annual grants in accordance with his findings pursuant to this subsection." 42 U.S.C. § 5304(d). See also § 5311(a). Given the review powers of the Secretary pursuant to §§ 5304(d) and 5311(a), a determination of non-compliance may result in the withholding of the projected second year funding. Under these circumstances, aggregating the projected funds for the second year to compute the amount in controversy is unwarranted because there presently is no basis upon which to assume that the amount for the second year will be the subject in controversy.

Jurisdiction under 28 U.S.C. § 1331 must accordingly be denied because it appears to a "legal certainty" that the "matter in controversy" is less than the jurisdictional amount. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845, 848 (1938).

### Fair Housing Act of 1968

Plaintiffs' fourth cause of action purportedly arises under the Fair Housing Act of 1968, 42 U.S.C. § 3601, et seq. Specifically, plaintiffs allege that an independent claim arises under § 3608(d)(5) as a consequence of defendants' alleged failure to comply with the affirmative requirements of this Act as required by § 5304(a)(5) of the Housing and Community Development Act. Section 3608(d)(5) provides:

"(d) The Secretary of Housing and Urban Development shall . . .

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."

The policy of the Act is to provide "for fair housing throughout the United States." 42 U.S.C. § 3601. The factual allegations of the case before me, however, make no claims regarding racial discrimination in the sale or rental of housing, 42 U.S.C. § 3604, in the financing of housing, 42 U.S.C. § 3605, or in the provision of brokerage services, 42 U.S.C. § 3606.

Section 3612(a) of the Fair Housing Act contains a specific grant of jurisdiction to the district courts to entertain civil actions to enforce the rights granted under that Act, without regard to amount in controversy. This action, however, cannot be considered to "arise under" the Fair Housing Act as is required under 28 U.S.C. § 1331.

In *Shulthis v. McDougal,* 225 U.S. 561, 569, 32 S.Ct. 704, 706, 56 L.Ed. 1205, 1211 (1912), the Supreme Court clarified the concept of "arising under:"

"A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law, upon the determination of which the result depends."

Similarly, in *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 199, 41 S.Ct. 243, 245, 65 L.Ed. 577, 585 (1921) the court stated:

"The general rule is that, where it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable, and rests upon a reasonable foundation, the District Court has jurisdiction under this provision."

See also *Bell v. Hood,* 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).

Plaintiffs' claim is not "colorable" under the Fair Housing Act and it cannot be said to rest upon a "reasonable foundation" so as to be cognizable under that Act. Plaintiffs' challenge is directed toward

funds designated for the construction of storm sewers. Although the Chester County grant has earmarked some funds for housing, plaintiffs have raised no challenge to those expenditures; consequently, this action is not one to enforce rights under the Fair Housing Act.

### Title VI, Civil Rights Act of 1964

Plaintiffs' fifth cause of action asserts a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.

Section 2000d provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Ostensibly, jurisdiction for such actions may be predicated upon 28 U.S.C. § 1343(4)[8] which does not require the jurisdictional amount. *Ficklin v. Sabatini*, 378 F.Supp. 19, 21 (E.D.Pa.1974). As with the Fair Housing Act claim, *supra*, this cause of action is said to arise from defendants' alleged failure to comply with § 5304(a)(5) of the HCDA.

The scheme of the Civil Rights Act of 1964 is essentially administrative. That is, § 2000d–1 requires the federal agencies to effectuate the general proscriptions of § 2000d by promulgating appropriate regulations consistent with the statute which provides federal assistance. It authorizes the agencies to bring about compliance by (1) cutting off such assistance upon an express finding on the record of a failure to comply after opportunity for hearing; or, (2) by any other means authorized by law. No action, however, may be taken until there has been notice of a failure to comply and a determination that compliance may not be secured by voluntary means. 42 U.S.C. § 2000d–1.

Pursuant to this mandate, HUD has promulgated an extensive regulatory scheme to ensure compliance with Title VI and the HCDA. See 24 C.F.R. § 1.1 et seq. (1975); 24 C.F.R. §§ 570.601, 570.912, 570.913 (1975). Plaintiffs herein did not avail themselves of these procedures, see 24 C.F.R. § 1.7 (1975), before seeking judicial redress. Under the prevailing standards governing judicial interference with the administrative process, this course is improper. *McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194, 203 (1969) set forth the appropriate guides for the exhaustion doctrine:

"Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved. . . . A primary purpose is, of course, the avoidance of premature interruption of the administrative process. . . . And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. . . . This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise. . . . In addition . . . [c]ertain very practical notions of judicial efficiency come into play as well. . . . And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors. Finally, it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."

These words are particularly appropriate regarding actions brought under Title VI. Thus, in *Adams v. Richardson*, 351 F.Supp.

---

**8.** 28 U.S.C.A. § 1343(4) provides:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

   \*    \*    \*    \*    \*    \*

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

636, 641 (D.D.C.1972), *aff'd,* 156 U.S.App. D.C. 267, 480 F.2d 1159 (1973), the court concluded that:

"The underlying thrust of the statute requires that the agency involved . . . attempt at the outset to secure compliance by voluntary means, if such method is reasonably possible. This course involves negotiation and negotiation takes time. To such extent, the defendants have discretion but such discretion is not unlimited."

See *Green Street Association v. Daley,* 373 F.2d 1, 8–9 (7th Cir. 1967); *Green v. Cauthen,* 379 F.Supp. 361, 378–9 (D.S.C.1974); *Hardy v. Leonard,* 377 F.Supp. 831, 834–38 (N.D.Cal.1974); *Feliciano v. Romney,* 363 F.Supp. 656, 672–73 (S.D.N.Y.1973); *North Philadelphia Community Bd. v. Temple University,* 330 F.Supp. 1107, 1110–11 (E.D. Pa.1971).

In the matter before me, at the time of the hearing, little more than six months had passed since the funds were released to Chester County. In that time, the Secretary employed procedures available under the HCDA to monitor the activities of the grantee. As of December 1975, one site visit had been conducted and others were scheduled. In effect, it appears, on the basis of the record before me, that HUD has been making a reasonable effort to ensure "voluntary compliance", which is consistent with the statutory scheme of "program review."

■ Because of the failure to exhaust the administrative procedures provided by § 2000d–1, the Title VI claim must be dismissed.

*42 U.S.C. §§ 1981, 1982, 1983, Fifth and Fourteenth Amendments*

The sixth cause of action asserts claims against all defendants under 42 U.S.C. §§ 1981, 1982, 1983, the Fifth and Fourteenth Amendments to the United States Constitution.

9. It is not necessary to consider whether jurisdiction may be predicated upon the federal question statute, 28 U.S.C. § 1331, in view of

I will consider first the claims asserted under §§ 1981 and 1982.

Section 1981 deals with "equal rights under law:"

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

Section 1982 guarantees the "property rights of citizens:"

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

Plaintiffs have not cited a jurisdictional basis for their § 1981 or § 1982 claim. I will assume that § 1343(4) is the basis for jurisdiction.[9]

■ Claims under §§ 1981 and 1982 are limited to instances of racial discrimination. *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Young v. I. T. & T. Co.,* 438 F.2d 757 (3d Cir. 1971); *Arnold v. Tiffany,* 359 F.Supp. 1034 (C.D.Cal.1973), *aff'd,* 487 F.2d 216 (9th Cir.), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974). The instant complaint is replete with conclusory allegations concerning the unconstitutionally exclusionary land use regulations of Willistown Township, but there is no factual allegation of racial discrimination in the defendants' actions and the complaint, therefore, fails to state a claim upon which relief can be granted.

plaintiffs' failure to establish the required jurisdictional amount in controversy.

Plaintiffs have also asserted a claim against all defendants under 42 U.S.C. § 1983 and its jurisdictional counterpart 28 U.S.C. § 1343(3). Section 1983 provides that:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

There are several jurisdictional barriers to plaintiffs' § 1983 claim. First, jurisdiction cannot be sustained over the federal defendants under this claim, inasmuch as these defendants do not act under color of state law. *Ramirez v. Weinberger,* 363 F.Supp. 105, 108 (N.D.Ill.1973), *aff'd,* 415 U.S. 970, 94 S.Ct. 1553, 39 L.Ed.2d 867 (1974). Second, jurisdiction cannot be sustained against the County of Chester or the Township of Willistown because these public entities are not "persons" within the meaning of § 1983. *City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). See also *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

The remaining defendants for purposes of § 1983 are the members of the Chester County Board of Commissioners and the Supervisors of the Township of Willistown.

Conclusory allegations unsupported by specific facts are insufficient to present a cause of action under § 1983. *Rotolo v. Borough of Charleroi,* 532 F.2d 920 (3d Cir., filed March 22, 1976); *Kauffman v. Moss,* 420 F.2d 1270 (3d Cir.), *cert. denied,* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970); *Negrich v. Hohn,* 379 F.2d 213 (3d Cir. 1967); *Tunnell v. Wiley,* 369 F.Supp. 1260 (E.D.Pa.1974), *aff'd,* 514 F.2d 971 (3d Cir.

1975). To maintain an action under § 1983, plaintiffs must establish that:

"(1) the conduct complained of must have been done or caused to have been done by a person acting under color of state law; and (2) the conduct must have subjected the complainant to the deprivation of rights, privileges or immunities secured to him by the Constitution and laws of the United States." *Meyer v. Lavelle,* 389 F.Supp. 972, 975 (E.D.Pa.1975)

See *Basista v. Weir,* 340 F.2d 74, 79 (3d Cir. 1965).

The only suggestion of deprivation alleged by the plaintiffs is that if the challenged funds are not spent in Willistown, "the plaintiffs would be eligible to receive these same funds to improve their housing situations."[10] Significantly, the plaintiffs did not seek participation pursuant to § 5304(a)(6) to formulate a plan for their communities. And even if the funds were withheld from Willistown, there is nothing to indicate that the funds would then be available to benefit the plaintiffs. Section 5306(e) provides that funds are to be reallocated "first, in any metropolitan area in the same State." See 24 C.F.R. § 570.409(f) (1975). In the case of Chester County, these funds would then be available to more than eighty communities.

For these reasons, I conclude that plaintiffs have failed to state a claim under § 1983 upon which relief can be granted against the individual Commissioners of the County and Supervisors of the Township. Rule 12(b)(6), Federal Rules of Civil Procedure.

Plaintiffs also assert causes of action against all defendants under the Fifth and Fourteenth Amendments to the Constitution of the United States. Assuming *arguendo* that Fifth and Fourteenth Amendment violations give rise to a cause of action, they would necessarily "arise under" the Constitution of the United States, and the amount in controversy for federal jurisdiction must be established. 28 U.S.C. § 1331; *Lynch v. Household Finance Corp.,*

10. Complaint at paragraph 37.

405 U.S. 538, 547, 92 S.Ct. 1113, 1119, 31 L.Ed.2d 424, 431 (1972); *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Since it has previously been determined that the amount in controversy does not satisfy the jurisdiction requirements, these claims must be dismissed. Rule 12(h)(3), Federal Rules of Civil Procedure.

For the foregoing reasons, plaintiffs' complaint will be dismissed as to all defendants and their motion for preliminary injunction must likewise be dismissed.