James W. ARDREY d/b/a Ardrey Insurance Agency, Inc., Bryce McLerran d/b/a Bryce & Associates Insurance, and Phil Carlin d/b/a Phil Carlin Agency, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**FEDERAL KEMPER INSURANCE COMPANY, Defendant.**

Civ. A. No. 90–7912.

United States District Court,
E.D. Pennsylvania.

April 22, 1992.

Patricia Carey Zucker, Balaban & Balaban, Harrisburg, Pa., for plaintiffs.

James J. Rodgers, Virginia L. Flick, James J. McHugh, Philadelphia, Pa., for defendant.

## MEMORANDUM & ORDER

HUYETT, District Judge.

This action arises as a result of the Pennsylvania General Assembly's enactment of automobile insurance reform legislation in February of 1990. *See* 75 Pa.C.S.A. §§ 1791–1799.7 ("Act 6"). Act 6 required insurers, *inter alia*, to reduce private passenger motor vehicle insurance rates by between ten (10) and twenty (20) percent. In reaction to this change in Pennsylvania's regulatory environment, defendant Federal Kemper Insurance Company ("Kemper")

changed its system of insurance agent compensation in Pennsylvania. Plaintiffs, James W. Ardrey d/b/a Ardrey Insurance Agency, Inc., Bryce McLerran d/b/a Bryce & Associates Insurance and Phil Carlin d/b/a Phil Carlin Agency bring the instant action individually and on behalf of a putative class of approximately two hundred (200) Kemper insurance agents and agencies located in the Commonwealth of Pennsylvania. Plaintiffs contend that Kemper's change in compensation constituted a breach of its contracts with individual agents and agencies throughout Pennsylvania. Defendant Kemper moves to dismiss this action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Plaintiffs oppose this motion on several grounds. For the reasons stated below, I shall grant defendant's motion to dismiss.

## I.  INTRODUCTION

Plaintiffs initiated this action on December 14, 1990. In their complaint, plaintiffs allege that Kemper attempted to re-write the compensation provisions of its contracts with insurance agents and agencies in Pennsylvania. Plaintiffs contend that Kemper's modification in the compensation system breached each of the approximate two hundred (200) agency agreements Kemper is party to in Pennsylvania. Defendant Kemper responds by arguing that its agreement with agents allows Kemper to unilaterally change the commission rates Kemper pays its Pennsylvania agents.

Plaintiffs state that prior to November 1, 1990, Kemper paid its agents a percentage of premium produced regardless of profitability. In other words, the Kemper agents were compensated based on a straight percentage of insurance premiums paid by the insured. In addition, Kemper awarded a profit sharing bonus for those agents with low loss ratios.[1] In reaction to Pennsylvania's adoption of "Act 6," 75 Pa.C.S.A. §§ 1791–1799.7, Kemper redesigned its compensation system. In short, Kemper eliminated the previous profit sharing bonus and introduced loss ratios into the schedule of commissions.[2] Essentially, this change in Kemper's compensation system allowed Kemper to tie its compensation more closely to the profits generated by its individual agents.

Plaintiffs allege two other objectives to be implicit in Kemper's change in compensation. First, plaintiffs contend that by forcing unpalatable agreements upon agents who cannot survive the loss in income resulting from the new compensation system, Kemper is able to circumvent the requirements of "Act 143," 40 P.S. § 241 *et seq.*, which restricts the at-will termination of insurance agreements in the Commonwealth of Pennsylvania. Second, plaintiffs argue that Kemper's use of loss ratios in calculating base compensation will create incentives for agents to eliminate business with adverse experience by circumventing Pennsylvania laws designed to limit the grounds upon which an insurer may cancel automobile insurance.

Kemper replies by contending that it acted within its contractual rights when it instituted the change in agent compensation. Further, Kemper denies the existence of any pretextual motives underlying its challenged action.

Kemper initially responded to plaintiffs' complaint by moving to dismiss on the ground that plaintiffs had failed to state a

---

[1] The use of loss ratios in profit sharing allowed Kemper to additionally compensate those agents whose business generated the most profit for Kemper. As Kemper explains: "[a]n agent's loss ratio is calculated by dividing the total dollars collected from policies written by an agent over a three year period by the total dollars paid for claims under those policies. *See generally* Insurance Information Institute, *Sharing the Risk* (3d Ed.1989). If the Company collects $100,000 in premiums from policies written by an agent but pays $60,000 in claims under the policies, the agent's loss ratio is 60%.

For purposes of calculating an individual agent's loss ratio, the Company caps the dollar amount paid on an individual large loss at $175,000." *See* Kemper's Memorandum In Opposition To Plaintiffs' Motion For Class Maintenance at 3, n. 1, *citing* Complaint, Exhibit D.

[2] The introduction of loss ratios involved a number of other departures from the previous compensation system which need not be described or addressed here at length.

claim upon which relief could be granted pursuant to Fed.R.Civ.P. 12(b)(6). By Order of August 19, 1991, the Court denied Kemper's motion to dismiss. In the August 19 Order, the Court concluded that the term "schedule of commissions" as used in Kemper's agency agreements was ambiguous. Accordingly, the Court concluded that the issue of whether defendant's changes in the schedule of commissions constituted a violation of plaintiffs' contractual rights was a matter that required consideration by the fact finder. *See* Order of August 19, 1991 at ¶ 14–15.

Plaintiffs subsequently moved pursuant to Fed.R.Civ.P. 23(b)(2) to maintain this litigation as a class action. By Memorandum and Order of March 4, 1992, the Court granted in part and denied in part plaintiffs' motion to maintain this litigation as a class action. 142 FRD 105. Pursuant to the March 4 Memorandum and Order, the Court permitted plaintiffs to maintain a class action pursuant to Fed.R.Civ.P. 23(b)(3). In the March 4 Memorandum and Order, the Court recognized, however, that Kemper had stated its intention to move to dismiss the claims of those class members who failed to meet the amount in controversy requirement for actions based on diversity of jurisdiction. *See* Memorandum and Order of March 4, 1992 at 16, n. 13.

Kemper now moves to dismiss this action for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). The essence of Kemper's motion to dismiss is that the members of the plaintiff class fail to meet the amount in controversy requirement of 28 U.S.C. § 1332(a). Plaintiffs oppose defendant's motion to dismiss on several grounds.

## II. DISCUSSION.

A. *Legal Standards Applicable To Rule 12(b)(1) Motions.*

■ The Court will ordinarily accept plaintiffs' well-plead allegation that the amount in controversy exceeds the jurisdictional threshold. *Hamilton v. Hartford*

Accident & Indemnity Co., 425 F.Supp. 224 (E.D.Pa.1977). It is established, however, that the complaint must allege facts sufficient to determine whether the jurisdictional amount has been satisfied and not plead solely to obtain federal court jurisdiction. *Id.* at 226. In a class action where the class members assert separate and distinct claims,[3] each class member's claim must exceed the jurisdictional minimum. In other words, plaintiffs must allege facts sufficient to establish that Kemper's new commission schedule results in damages exceeding the jurisdictional amount. *See Zahn v. International Paper Company,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

Defendant Kemper argues that plaintiffs' claims are not in excess of $50,000, the amount in controversy requirement of 28 U.S.C. § 1332. "Once challenged, the party seeking to invoke the jurisdiction of the federal courts has the burden of proving its existence ..." Wright, Miller & Cooper, *Federal Practice and Procedure* § 3702 at 18, *citing Gibbs v. Buck,* 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939); *Bryfogle v. Carvel Corp.,* 666 F.Supp. 730 (E.D.Pa.1987). "The burden is on the plaintiff to satisfy the court that the jurisdictional amount is really and substantially involved." *Hamilton v. Hartford Accident & Indemnity Company,* 425 F.Supp. 224, 226 (E.D.Pa.1977).

■ The test for determining whether the requisite jurisdictional amount has been satisfied is the "legal certainty test." Unless it appears to a legal certainty that plaintiffs' claims are for less than the jurisdictional amount, the amount in controversy required will be satisfied. *St. Paul Mercury Indemnity Company v. Red Cab Company,* 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938). As Moore explains:

In practice, the plaintiff's burden of proving the requisite amount in controversy in a case of original federal juris-

---

**3.** Neither plaintiffs nor defendant dispute that the class members' claims constitute separate and distinct claims.

diction is not a heavy one. As noted, dismissal is appropriate only if its is "clear to a legal certainty" that the jurisdictional amount could not be recovered. Thus, the plaintiff need only present allegations or proof that it is not clear to a legal certainty that she will not recover less than the jurisdictional amount. Accordingly, the court should uphold jurisdiction even if the face of "grave doubt" about the plaintiff's ability to recover such a sum, provided it is not clear to a legal certainty that she cannot. She need not show with certainty that a particular amount is involved, and she is entitled to the benefit of facts that she could prove at trial.

1 Moore, Federal Practice ¶ 0.92[1], pp. 831–832 (2d Ed.). Accordingly, the Court must determine whether it appears to a legal certainty that each or any plaintiff has failed to satisfy the amount in controversy requirement under *Zahn v. International Paper Company*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

**B.** *Plaintiffs' Claims Do Not Exceed $50,000.*

■ The defendants correctly contend that "[a]bsent an *unconditional* right to future payments under a contract, such payments are not considered in computing the amount in controversy." *See* Defendant's Memorandum In Support Of Motion To Dismiss at 6, *citing Burns v. Massachusetts Mutual Life Insurance Company*, 820 F.2d 246, 248 (8th Cir.1987) (affirming district's court's decision to grant defendant's motion to dismiss for lack of subject matter jurisdiction where plaintiff-insured sought to enjoin insurer from distributing dividends in accordance with dividend policy and sought to meet amount in controversy requirement by including future potential dividends in damage claim); *Indianer v. Franklin Life Insurance Company*, 113 F.R.D. 595 (S.D.Fla.1986) (holding putative plaintiff class could not include future dividend payments in amount in controversy where dividend payments were within discretion of defendant). *Indianer v. Franklin Life Insurance Company* specifically teaches:

it is clear that Plaintiff has no legal or contractual right to any future benefits because future dividend payments lie wholly in Franklin's discretion. "It is well settled that when an *unconditional* right to future payments exists, the court may consider such payments in computing the amount in controversy." *Lenox v. S.A. Healy Co.*, 463 F.Supp. 51, 52 (D.Md.1978), *citing Aetna Casualty & Surety Co. v. Flowers*, 330 U.S. 464, 467–68 [67 S.Ct. 798, 799–800, 91 L.Ed. 1024] (1947). In *Aetna*, the Supreme Court allowed consideration of future payments to be proper for the amount in controversy requirement, only because "the right to *all* the payments [was] in issue." *Aetna*, 330 U.S. at 468 [67 S.Ct. at 800]. The *Lenox* and *Aetna* cases are distinguishable from the instant case because here *no unconditional* right to future payments could ever exist under the insurance contract nor could a right to all the payments ever be in issue since it is up to Franklin to decide whether or not to pay a dividend in any given year. *Id.* at 600 (emphasis added).

Here, the plaintiff-agents' commissions were wholly within the control of defendant Kemper. Accordingly, under the persuasive reasoning of *Indianer v. Franklin Life Insurance Company*, plaintiffs' speculative claims for future damages may not be considered in computing the amount in controversy.

The individual agency agreements between Kemper and its Pennsylvania insurance agents vest Kemper with the right to change the commissions payable under the agency agreements at any time. In pertinent part, paragraph four (4) of the Kemper's Agency Agreement provides:

As full compensation for services, Company [defendant] shall pay Agent [plaintiffs] commissions on premiums written and paid for, at the rates specified in the schedule(s) attached. Agent shall pay Company return commission at the same rates on any return premiums, including return premium on cancellation ordered or made by Company. Where no commission rate has been specified, but in-

surance has been submitted and accepted by Company, the rates shall be determined by the Company. *The schedule(s) of commission allowable shall be subject to change by Company at any time by written notice to Agent respecting insurance written or renewed thereafter.*

Agency Agreement at ¶ 4 (emphasis added).

On its face, the agreement provides Kemper with the discretion to control the future commission rates payable to its agents.[4] In fact, plaintiffs admit that Kemper could have imposed any change in the flat commission rate paid agents for new and renewal business. *See* Carlin Dep. at 25 (December 6, 1991); McLerran Dep. at 86–87 (December 6, 1991).

Prior to December 16, 1990, Kemper agents received an eighteen (18) percent commission on all new adult private passenger premiums written and paid and a commission rate for renewal business between twelve (12) and sixteen (16) percent depending on the individual agent's premium volume. *See* Complaint at Exhibit B. Under the challenged compensation scheme, the commission rate for new and renewal business varies between six (6) and sixteen (16) percent. The variance in commission rate depends upon an individual agent's premium volume and loss ratio. Significantly, plaintiffs concede that Kemper could have imposed a flat six (6) percent commission rate on any or all Pennsylvania agents by simply providing written notice to the plaintiff-agents. *See* Carlin Dep. at 25; McLerran Dep. at 86–87. Further, the lowest actual commission rates paid to agents under the new schedule are twelve (12) percent for new business and ten (10) percent for renewal business. *See* York Aff. at ¶¶ 2–3.

Under the persuasive reasoning of *Burns v. Massachusetts Mutual Life Insurance Company*, 820 F.2d 246, 248 (8th Cir.1987) and *Indianer v. Franklin Life Insurance Company*, 113 F.R.D. 595 (S.D.Fla.1986), it is apparent that plaintiffs fail to meet the amount in controversy requirement. Simply put, plaintiffs' claims for future damages are wholly speculative because Kemper could have imposed a flat commission schedule which provided less compensation to each Kemper agent than the compensation provided for under the challenged commission schedule. Further, if the Court declared Kemper's December 16, 1990 commission schedule illegal under the terms of the Agency Agreement, Kemper would be contractually entitled to set commission rates at a lower rate retroactive to December 16, 1990.

*Johnson v. County of Chester*, 413 F.Supp. 1299 (E.D.Pa.1976) provides additional support for the conclusion that plaintiffs' complaint must be dismissed for lack of jurisdiction. In *Johnson*, the court squarely confronted the issue of how the amount in controversy should be calculated where payments of future monies are fully within the discretion of one party. *Johnson* involved the challenge of certain federal grants to Chester County pursuant to the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 *et seq* ("HCDA"). In analyzing the amount in controversy for purposes of establishing jurisdiction under 28 U.S.C. § 1331, the *Johnson* Court stated:

> [p]laintiffs argue that since the HCDA contemplates three year programs, the amount in controversy should be computed by aggregating the amount requested and approved for the three year period.... *in the instant case, the "matter in controversy" is the first year funding for the construction of storm sewers by Willistown Township.* That sum

4. The Court notes that this conclusion is consistent with the Court's August 19, 1991 Order concluding that the term "schedule of commissions" is ambiguous. Although the Court concluded that the contractual term "schedule of commissions" is ambiguous with respect to whether the term contemplates the inclusion of loss ratios in calculating commissions, it is apparent that Kemper possesses the right to unilaterally change the schedule of commissions within the meaning of the contractual term. Neither party disputes that under the Kemper agency agreements, Kemper possesses the discretion to change the straight commission rates payable to its Pennsylvania agents and agencies.

is $9,000. The Funds earmarked for the second year, $18,000 are not "ripe" for controversy. *Section 5304(d) of the HCDA provides for annual review of the performance made by the grantee, particularly in regard to statements of needs and assurances under § 5304(a).* To that end, the Secretary [of HUD] is empowered to make "appropriate adjustments in the amount of the annual grants in accordance with his findings pursuant to this subsection." 42 U.S.C. § 5304(d). *Given the review powers of the Secretary pursuant to §§ 5304(d) and 5311(a), a determination of noncompliance may result in the withholding of the projected second year funding. Under these circumstances, aggregating the projected funds for the second year to compute the amount in controversy is unwarranted because there presently is no basis upon which to assume that the amount for the second year will be the subject in controversy.*

Jurisdiction under 28 U.S.C. § 1331 must accordingly be denied because it appears to a "legal certainty" that the "matter in controversy" is less than the jurisdictional amount. (citation omitted).

*Id.* at 1308–09 (emphasis added).

Plaintiffs assert no property right, contractual right or entitlement to continued commissions at the rates effective before December 16, 1990. Rather, as in *Johnson v. County of Chester*, there is no basis to assume that commissions would continue at a specified rate given Kemper's established ability to unilaterally alter the straight commissions paid to insurance agents in the Commonwealth of Pennsylvania.[5] Accordingly, jurisdiction must be denied as it appears to a "legal certainty" that the matter in controversy is less than the jurisdictional amount of $50,000.

---

5. Plaintiffs admit that their lawsuit is wholly prospective in nature. Specifically, plaintiffs state: "[s]ince the lawsuit was filed *before* the challenged actions of Kemper took place, all damages were prospective in nature." *See* Plaintiffs' Memorandum In Opposition To Defendant's Motion To Dismiss For Lack Of Subject–Matter Jurisdiction at 2, n. 2.

Plaintiffs' arguments against dismissal lack merit. First, plaintiffs contend that the amount in controversy requirement is met because plaintiffs' complaint initially sought declaratory and injunctive relief. *See* Plaintiffs' Memorandum In Opposition To Defendant's Motion To Dismiss For Lack Of Subject–Matter Jurisdiction at 9. The essence of this plaintiff position is that the amount in controversy requirement in injunctive and declaratory judgment cases is measured by the value of the property plaintiffs seek to protect and the value of the interest to be protected by the equitable relief requested. *Id.* (citations omitted). Plaintiffs propose that the value of the equitable relief requested should be measured in terms of the decrease in future commissions caused by Kemper's change in its compensation scheme and by the diminution in the value of their agencies as a result of the change in commissions. *Id.* at 9–11. This argument fails to address the speculative nature of plaintiffs' claims for lost commissions in light of Kemper's ability to change the straight commission rates unilaterally. The Court will not permit plaintiffs to recast the same arguments regarding future damages by raising the specter of injunctive and/or declaratory relief. Plaintiffs' proposed measurement of the interest sought to be protected also involves the calculation of speculative future damages. Under the Agency Agreement, Kemper possessed the ability to change the commission rates to a level less lucrative to the agents than the system adopted on December 16, 1990. Whether relief is phrased in terms of compensatory damages or equitable relief has no bearing on the inexorable conclusion that under *Burns v. Massachusetts Mutual Life Insurance Company*, 820 F.2d 246, 248 (8th Cir.1987)[6], *Indianer v. Franklin Life In-*

---

6. In *Burns,* the Eighth Circuit addressed a similar equitable relief argument and concluded that "[w]here the heart of a cause of action is a claim for future benefits, the amount in controversy is the present value of the claimed future benefit." *Id.* at 249. Here, the future benefit lies within the discretion of defendant Kemper. Under this circumstance, the present value of the claimed future benefit falls below the juris-

*surance Company,* 113 F.R.D. 595 (S.D.Fla.1986) and *Johnson v. County of Chester,* 413 F.Supp. 1299 (E.D.Pa.1976), it is legally certain that plaintiffs have failed to meet the amount in controversy requirement.

■ Plaintiffs' second argument against dismissal must also be rejected. Plaintiffs contend that "Act 143 creates a statutory entitlement to continued commissions on the part of the Kemper agent class for a period from between 15–27 months." *See* Plaintiffs' Memorandum In Opposition To Defendant's Motion To Dismiss For Lack Of Subject–Matter Jurisdiction at 13. Plaintiffs' interpretation of Act 143, 40 P.S. § 241 *et seq.* is simply incorrect.

Act 143 regulates the ability of insurance companies to terminate contracts with insurance agents and agencies in Pennsylvania. *Id.* at § 242(a). In the event an insurance company decides to terminate an agency agreement due to an insurance agent's adverse experience, mix of business, or lack of premium volume, Act 143 requires insurers to make certain attempts to rehabilitate the agent's business before termination. *Id.* at §§ 242(e), 242(f). Further, when an insurer notifies an agent that its contract will be terminated, "the insurer shall offer to continue such agent's policies and any amendments thereto, through such agent for a period of 12 months from the effective date of termination, *subject to the insurer's current underwriting standards* [and] [t]he terminated agent or an agent under rehabilitation shall be entitled to receive commissions on account of all business continued or written pursuant to this subsection *in accordance with the commission rates in*

*such agent's agreement." Id.* at § 243 (emphasis added).

Act 143 only addresses the termination of insurance agency agreements.[7] Further, Act 143 does not reach or regulate changes in insurance agent compensation or commission rates absent termination.[8] As a unilateral change by Kemper in the commission rates paid to insurance agents would not terminate the individual agency agreements, Act 143's provisions are inapplicable to this case. Accordingly, the Court must reject plaintiffs' argument under Act 143. As plaintiffs have failed to meet the jurisdictional amount requirement, the Court does not possess original jurisdiction pursuant to 28 U.S.C. § 1332(a).

## III. CONCLUSION.

For the reasons stated above, I shall grant defendant's motion to dismiss for lack of subject matter jurisdiction.

dictional minimum of $50,000. *See e.g. Johnson v. County of Chester,* 413 F.Supp. 1299 (E.D.Pa. 1976).

**7.** Examination of cases interpreting and relying upon Act 143 demonstrates that Act 143 simply addresses the termination of insurance agency agreements. *See e.g. Travelers Indemnity Co. v. Commonwealth Insurance Department,* 126 Pa. Cmwlth. 41, 558 A.2d 568 (1989); *R.A. Freudig Associates v. Commonwealth Insurance Department,* 110 Pa.Cmwlth. 311, 532 A.2d 509 (1987).

**8.** The Court will not read protections into Act 143 that the Pennsylvania legislature did not create. Act 143 addresses the termination of agency relationships as opposed to the modification of agency agreements. For a thorough discussion of a statute regulating an insurance company's ability to modify agency agreements, *see Nationwide Mutual Insurance Company v. Insurance Commissioner,* 67 Md.App. 727, 509 A.2d 719 (1986), *cert. denied* 307 Md. 433, 514 A.2d 1211 (1986) (interpreting Maryland Code 1957, Art. 48A, § 234B(d)).